Good morning. May it please the court. My name is Andrew Clark, and I'm representing Terrence Reeves, who's the appellant. Mr. Reeves is a plaintiff in a case that was dismissed in district court. We appealed the case on one for the dismissal at the motion to dismiss phase of the claim of discrimination. We also appealed the case on the summary judgment ruling of the district court on our claim of hostile work environment and also retaliation. Mr. Reeves was working prior to joining this division. Mr. Reeves had 15 years in the federal government, never got a derogatory remark on any of his performance evaluations. Not three months after he joins this division is he called in for performance issues. And these performance issues are suspicious, and we believe that because they were pretty textual. The performance issues are suspicious because of the fact that we complain that the first adverse, that the first action from the defendants occurred in August, when there was an issue with the supervisor talking about an Excel spreadsheet and that the Civil Liberties Division, all they do is just put forth spreadsheets and they don't do a good job. That was the first issue. Now, that is a month after Mr. Reeves starts. So before Mr. Reeves starts, there are already issues with this division, according to these division chiefs. So then two months after that, because he says, please don't talk about my employees, two months after that, they now say that there's an issue with Mr. Reeves' performance. And they cite to missed deadlines, communication with his employees. And then they have a Halloween party. Halloween party, no one from his division was invited, although they were all- Except the plaintiff himself, right? Except the plaintiff himself, correct. It seems like a, so I wouldn't describe it as conventionally speaking evidence of race discrimination against the plaintiff, based on a protected characteristic evidence that the plaintiff was included in an off-site work function. I understand your position, Your Honor. So, I mean, they invited me, but they should have invited other people as evidence that they engaged in discrimination against me. Correct, because the Privacy and Civil Liberties Union, there were no minorities from that division, except for- I'm just saying, I'm just, I'm going through the chain of inferences we're being asked to follow here. And I do think, like, for example, that there are off-site work events and most people are included, but some people are excluded, is the kind of thing that could be evidence of discriminatory intent. It just seems like the inference is severely undercut when the plaintiff himself was invited to the event in question. Yes, except for the explanation provided that members of the Civil Liberties Division would not have wanted to see white people dressed in drag. That was a statement that was made, which is a racial undertone saying, thank you, Your Honor. And even after, remember, we're dealing with a pandemic during the course of this as well. So now we fast forward to February of 2020. Mr. Reeves was wearing sneakers to commute into the office. When he got into the office, he would change his shoes. Now they have an issue with the fact that he's wearing shoes coming into the office. They set forth after this February 2020 meeting, set forth a whole new policy about sneakers based on the fact that Mr. Reeves was coming into work wearing sneakers. On February 9th, that was February 7th, on February 9th, 2020, there was a contractor that left. His division chief, Gondek, said that it was because of him, because of Mr. Reeves. Mr. Reeves disputed that, wanted more evidence about the fact that he thought that he was just leaving just for another opportunity. Mr. Gondek then balls up his fist and slams the table at that, or balls up his fist, slams the table, happens later. Then we go to May 29th of 2020. That's when we have the midpoint review. The midpoint review doesn't end up happening because Gondek and Chichetti are in this meeting. Although they don't attend and they admit that they don't attend other meetings with other heads of chief. But Mr. Reeves felt like this was done and was disparately done because of the discrimination that he experienced before, because of the complaints that he made before. So he believed that that is why they changed their policy. And both of these chiefs were now in the office. They didn't end up having the midpoint review. Mr. Reeves then sends an email about the disparate treatment. And that's his first. That's an informal complaint that he makes. In July 28th, 2020, he then makes another complaint about disparate treatment and also about the aggression from especially from his chief had Chichetti. On October 28th, he gets a review at this point. And mind you, everyone is working remotely for about a three month period during the pandemic. They come back. I believe it was around the August or September time period. And now he's getting a review saying that he's not meeting any of his performance metrics, which then in January leads to him being terminated in the midst of him getting ready to transfer to a whole nother division. Let me focus you, if I could, on your complaint on the dismissal. I read the complaint to say you did say subject to unlawful conduct and adverse actions because of his race. And I assume that you included four or five things, including some of the things you've talked about today, as evidence of either hostile environment, discrimination, whatever else you're claiming. Yes, sir. Anything, anything else included in there that would go to your complaint that would permit it to survive a motion to dismiss? Yes, Your Honor, we do talk about another division leader who was a white female who was in the same position, in the same grade under Mr. Chichetti as well, that did have performance issues, but was not graded the same way that Mr. Reeves was graded. But those things were clear. Yes, yes, Your Honor. So yeah, tying off that, could I ask you, as succinctly as you can, tell me what allegations in the complaint do you think support an inference? This is on count one, the discrimination count. What are the, you think, the best allegations in this complaint that support an inference of discrimination because of race? Yes, Your Honor. The best, I would say the best one is when we're looking at the wearing the sneakers in the office in February. Paragraph, please. What paragraph of the complaint are we talking about? This was, I'm sorry, Your Honor, I do have my appendix on my iPad because it's over a thousand pages. So the allegations about the sneakers is the place that you think is the best allegations, again, that are not simply consistent with discrimination based on race, but are, under Twombly and Iqbal, sufficient to move the needle to say that it was because of race? Well, I wouldn't say that individually, but. Okay, I'm asking, where, because, I mean, the district court said you did not adequately allege there was discrimination because of race, and you're asking us to reverse that. So I'm asking what provisions of the complaint do you think provide the strongest inference of discrimination because of race? Yes, if you look at the totality. That's not how we do Twombly and Iqbal. You need to tell me what language in the complaint you think does this. Yes, when we talk about first, one month into him starting his position that there are complaints about the minority members of his division, he tells them to stop talking about his division. That's the first. That's just one month in. Him telling his supervisors not to talk about his subordinates as evidence of discrimination because of race? Because of race, because of the makeup of his division. Because he told them to not talk about his division? I mean, that might be evidence of retaliation conceivably, but I don't see how that's, I don't see how your client's own statements are evidence of discrimination because of race. How about, is your alleging the complaint that he said, that he warned him that if he filed a complaint, he would fire him? And that action had just happened to a person of the African race? Yes, and that's the first meeting that he has with them. Did you put that in your complaint? Yes, that was, that was. And that's the first meeting that he has with them. Isn't that consistent with the district court's reading of your complaint, that you specifically tied the adverse employment actions to retaliation, but not to race discrimination? There's a hostile work environment claim, I understand, that's based on race. But the district court read the complaint reasonably, I think, to understand that the termination and the negative performance review, which are the only two adverse employment actions, that you were alleging those were because of retaliation. So, where in the complaint do you allege that those were because of race? And I understand the court's question. And in the complaint, the complaint doesn't specifically allege that the adverse employment action is the race discrimination. But rather the actions prior to him being fired, him getting a derogatory performance review, that those are pretextual to the fact that he was discriminated against by having a different standard for what he has to wear to work. A different standard for how he has to perform on his job. But to make a case of race discrimination, you first have to give us a reason to think that the adverse actions happened because of race, right? That has to be plausible. Apart from whether, well, they have a reason, and the reason is he's received bad performance reviews from day one. And then you say, well, it's pretextual, right? That's kind of a secondary question. We have to initially just be able to read the complaint and see that there's a plausible claim that he was fired because of his race. And where's that? Understood, Your Honor. And I would admit to the court that there's nothing specific that says that he was fired because of his race. Well, you can have the same facts support a different type of, a different issue. For example, hostile environment discrimination. But you've got to specify that those same acts applied would support a claim for hostile environment or support a claim for discrimination because of race. You could use the same facts, but you've got to sort them out so the district judge, as Judge Rushing pointed out, it looked like you were catering your pleadings to just one thing. Understood. In that section dealing with discrimination, there is a reference to the facts, and I do see the court's issue with referencing all of the facts without putting in specific facts is what the court took issue with. But it was all incorporated and should have all been included in the court's analysis of whether or not there was race discrimination. And, Your Honor, when we're dealing about severe and pervasive, that was what was, I think, the district court's issue with the case is that it wasn't severe and pervasive enough. They were making, the court was, the defendants were making arguments and the court was making rulings about the fact that they believed that the actions of Mr. When you talk, when you look at the performance review that Mr. Reeves received at the end of his employment, and the fact that within months of him starting his employment, that they had an issue with the division's performance, that gives everything that happens in between, that gives the context that this was not a neutral based review. From the beginning, they had it out for Mr. Reeves, they wanted him gone. Once he did not play by their rules in August, when he didn't allow them to speak poorly about his chief members. From then on, they documented everything that they believed was derogatory performance reviews from not only him but also his team members. Your Honor, if there are no other questions, I believe that my time is up. Thank you. We'll hear from the government's counsel. May it please the court, Assistant U.S. Attorney Peter Baumhart on behalf of the defendants. This is a case, like many others, this court has considered where the plaintiff's view of his own performance differs greatly from that of the defendant's.  The record in this case amply bears out that plaintiff's performance did not live up to his employer's expectations, almost from the beginning of his tenure at NGA, and never meaningfully improved. And while plaintiff insists that it must have been discrimination or retaliation at work, rather than his supervisor's perceptions of his shortcomings, there is simply no evidence that creates a genuine dispute of material fact on that point. Plaintiff also failed to plausibly plead that racial discrimination was behind the few actionable adverse personnel actions in the complaint. This court should affirm the judgment. Okay, let's take you to the retaliation claim. So I read the following sentence in the district court's opinion, this is JA 1028. There is no evidence of any recognized basis on which pretext can be reasonably inferred for purposes of his firing. What about the fact that the plaintiff testified or gave some sort of statement that on one of my first days of work, someone says, if you ever file an EEO complaint, I will fire you. He filed an EEO complaint and he was fired. I don't understand why that is not plausible evidence that he was fired because he did the thing that his supervisor said, if you do, you will be fired. So your Honor, first I would point out that the comment was allegedly made by Mr. Kachetti, who is not the person who decided to remove him. Well, hold on, let's get back to allegedly. So on the summary, you agree that the plaintiff testified the comment was made, right? Yes. So for purposes of summary judgment, it wasn't allegedly made, it was made. Fair enough, Judge Huygens. Yes, assuming that the comment was made as the plaintiff testified to, it was made by Mr. Kachetti. Mr. Kachetti did not make the decision to remove plaintiff from federal service. That decision was made by Kimberly Thompson, the head of human development, after the proposal to remove plaintiff had been considered by two separate levels of independent decision makers, which was employee relations and then the performance evaluation. But that's an argument that it breaks the causal chain, because there's two ways to interpret the statement, and since it's summary judgment, we interpret it in the way that's favorable to him, not the way that's favorable to you. The way that's favorable to you would be, if I have anything to say about it, you'll be fired. Or if I have anything to do with it, you'll be fired. But what it could also mean is, oh, sorry, I've been working here for a very long time, me, your supervisor. I know what happens to people who file EEO complaints. So I'm just going to tell you as a friend, if you do this, you're going to get fired, because we fire people who file complaints like this. You're right. I think that is potentially a too favorable way of reading that testimony for the plaintiff. I think there's a lot of inferences that would have to be, would have to follow along. It's just, it's very rare that you get a retaliation claim that says, crystal as. A supervisor says, and again, I understand your position is that almost certainly that it wasn't said. But on summary judgment, we have to assume it was said. We almost never get employment discrimination claims where people are as unbelievably stupid as to say, if you do this, I will fire you, and then fire people, right? Because that's brazenly illegal. Right. I think it is an unusual part of the case in that respect. But I would, again, point the court to. But it's not implausible. I mean, you're not asking us to discount the statement on the grounds that it's so implausible it doesn't warrant an assumption of truth under Twombly. So. Like Twombly says, like if the plaintiff says, if the plaintiff talks about his experience with time travel or Little Green Men, you don't have to accord an assumption of truth to something that breaks reality as we understand it. The state, I mean, it may be unusual, it may be surprising, it may be really ill-advised that your supervisor would say something like this to you. But it's not so implausible we can pretend it's not true for purposes of deciding this issue, right? I would agree with that. Okay. So we have to assume it was actually said. Yes. I agree with that. And what's your best authority for the proposition that a supervisor told me if I did something I'd be fired and then I was fired is not enough to create a genuine dispute of material fact about whether that is in fact what happened? So I just want to make sure I answer your question accurately. No, I understand. I'm not saying there is a dispute of material fact. Sorry, the fact that the statement was made, the fact that he did the thing, it was basically an if-then statement. If X, then Y. There's an if-then statement. And we know that X happened, and we know that temporally after X, Y also happened. And those are the three facts that we have. Why is that not enough to create a genuine dispute of material fact that the reason that Y happened was because of X? And the evidence that that happened, in addition to the fact of the temporal sequence, is that someone literally said if X, then Y, and then X, and then Y. So I would point the court to three different cases. First, for the notion that a statement that's made over a year prior to the adverse action at issue doesn't bear on the pretext part of it, is Lange v. Federal Express Corp. I would point the court for the proposition that a decision by or a statement by the non-decision maker is not evidence of retaliatory animus is I think it's Walton v. Harker. And for the point that it matters on this point, that it went through multiple levels of independent decision makers is Massaro v. Fairfax County. So those are the three cases I would point you to. Did he start receiving the negative performance reviews before or after he filed an EEOC complaint? Your Honor, he started receiving. There's documented performance issues by Mr. Gondek and Mr. Caccetti in the record before he engaged in protective activity. It was in like the first couple months, right? Yes, Your Honor. I mean, so in some of Mr. Gondek's and Mr. Caccetti's documentation, there are issues arising as early as late August. We have emails between Mr. Gondek and I believe Latoya Allen, who I think was in human development, or possibly employee relations in late September into October. And the first protective activity the plaintiff engages in that Mr. Gondek and Mr. Caccetti had any knowledge of was in June 2020 when he makes the call to the anti-harassment division. So, yes. So those three cases you decided, is any one of those in your brief? Massaro is, and Walton and Lange I've found as I've been preparing. Did you tell the other side that you were going to spring these cases on them at oral argument? We cited Lange, I believe, in the district court. So that's a no? In the sense that you didn't file a 28-J letter or anything like that? No, Your Honor. We didn't file a 28-J letter. Okay. I guess these cases about temporal proximity strike me as fundamentally different, and let me say why and let me give you a chance to explain why I'm wrong. Those are cases that basically the temporal proximity is the time between when you file the EEO charge Okay, so let's take the easiest case. The easiest case would be I file an EEO charge and literally 30 seconds after EEOC notifies my employer, my boss picks up the phone and says, Toby, you're fired, right? In that case, the temporal proximity provides extremely strong evidence, right? And I get the point that if that's all the evidence we have is the delay between EEO charge and adverse action, that the longer it gets, the inference gets weaker and weaker and weaker and weaker and weaker and weaker and weaker. That makes total sense, right? Because the mere fact that because X preceded Y does not prove that X caused Y. And that the bigger the gap between X and Y gets, the weaker the inference that that's Y gets. But in virtually all of the cases that say that, that I have seen, if not all of them, there is not a point at which someone who is above the plaintiff in the org chart literally said to the plaintiff, if you do X, then Y. Do you know any case that has had that fact pattern? Of the cases that say the longer that happens, it undercuts the inference of pretext. I wasn't able to find any where there was literally allegedly a statement by a supervisor that said, if you do this, we'll fire you. I'm not recalling a specific case that says... Not even that makes that point, but that involves that fact pattern. All the cases I've seen about temporal proximity are just the plaintiff says, I filed a complaint and five days later I was fired. But not the allegation is I was told if I filed a complaint, I'd be fired. Right. And I take your point. And I'm trying to remember, I don't remember off the top of my head whether the comment in Lange was made by a supervisor, but the court did in Lange note that it mattered, that it was made before the plaintiff ever engaged in protected activity and long before the challenged employment action occurred. And so, I mean, that's the closest I can give you. Just for my edification, honestly, is telling an employee, if you file a complaint, I will fire you, is that itself an adverse employment action? Or is that itself something that violates Title VII? I mean, the reason I imagine that you would tell someone if you file a complaint, I will fire you, is to deter them from filing a complaint. And if it works, if the person never actually files a complaint, has that itself been a Title VII violation? I'm not aware of any case that's addressed that. Because it seems really troubling that the way you could get out of EEO complaints is just tell people, by the way, don't ever do that. And if the threat is really effective, you won't violate a Title VII. I understand what you're saying. I know the Burlington Northern Standard is couched in terms of, you know, would dissuade a reasonable employee. Feels like it might dissuade a reasonable employee. What do we do if it's evidence at all of the internal investigation that shows that some substantial percentage of the employees believe or view supervisors conducted retaliatory conduct? What do we do with that evidence? Or if it is evidence? I'm sorry, are you referring to the anti-harassment? There was an internal investigation about the, where several of the employees were questioned about whether there was retaliatory conduct or not. And they answered the question, yes, there was. A history, a culture of it. So if Your Honor is referring to the anti-harassment investigation, I believe that was focused on Mr. Reeves' allegations of a hostile work environment rather than retaliation. And the employees did make statements to the investigator that there was an environment of, you know, probably too much joking and maybe some disrespectful comments. But the investigator ultimately, I might add, several of the employees said that the plaintiff himself was part of the problem. It was treating his employees poorly. But the investigator ultimately concluded that plaintiff's allegations of a hostile work environment were not substantiated. And that the supervisor's conduct, Mr. Caccetti, Mr. Gonnick, may have violated, I think, particular DOD and or NGA rules about, like, a respectful workplace. Well, forget about his conclusion. What do we do about the statements that the individual employers made to him that there was a hostile environment? Well, so Your Honor, I mean, to the extent that there's a hostile environment that the employees make claims of certain activities by Mr. Caccetti, Mr. Gonnick, that plaintiff there's no evidence that plaintiff himself either experienced or knew of, then those aren't considered for purposes of his hostile work environment claim. And that's off the top of my head, this Court's decision in Perkins. So your position is it's not relevant to his claim? Yeah, unless he himself testified that he experienced it or knew about it, then it's not relevant for his claim. So can I ask you about the AR-15 incident, which I regard as the sort of most probably troubling for the hostile work environment claim? Can you just help me understand? The top line for this isn't an objectively hostile work environment because the government's view is what? Like, let's assume that the AR, well, so you have this issue about he tells two slightly different stories. Let's assume for the sake of argument that I do not think that there's an irreconcilable conflict between the two versions of events he gives, and thus we have to credit the one that is most favorable to him. If that's true, what's your argument for why that's not a hostile work environment? So I will say that plaintiff himself, this is not about, there's two parts of that particular encounter that I think are salient. Specifically respecting the picture of the AR-15, plaintiff himself testified that he did not think that showing the picture was racially motivated. It instead occurred in the context of Mr. Caccetti having had a conversation with several other contractors in the office earlier in the day, of which plaintiff was aware about the firearms they owned. But then he does say that when the person then pivots and says, hey, by the way, sort of apropos of nothing, while we're looking at this gun, would you like me to tell you why I bought it? And then he tells a story that's extremely racially inflected. So on that part, again, a couple points. First, Mr. Reeves himself drew the distinction between whether he thought that showing the picture was racially motivated and whether the story that followed was racially motivated. Although, again, as you acknowledge, he was not entirely clear on what Mr. Caccetti said, one of which was race neutral and one of which was not. And so I think we credit Mr. Reeves' testimony that the showing of the picture wasn't racially motivated. Because that's how Mr. Caccetti testified as well. And so there is no dispute. It's a little, that's a little weird to say, though. Because that, I mean, the defendant, including the government when it's an offendant, employment discrimination claims, which is to say, just because the plaintiff believes that something was racially motivated, we don't give it a presumption of truth, right? There are cases that sort of say like, a plaintiff's unadorned statement, I believe I was fired based on race, gets basically no weight. For Twombly-Iqbal purposes, it gets basically no weight for summary judgment purposes. Because a plaintiff's unadorned, I believe something illegal happened to me, is just a restatement of the fact that the plaintiff believes he has a cause of action against the defendant and adds no additional facts. So why wouldn't the inverse be true, too? Which is that I mean, I understand that for hostile work environment, he has to show that he both subjectively experienced a hostile work environment and that it was But, so help me understand that. So, Your Honor, I think it's actually the other side of the same coin. Okay. Which is that there has to be evidence that what happened was racially motivated. The plaintiff's speculation won't do it. And here, my point is just that there is no evidence, even from the plaintiff, even his own speculation, as to there was a racial motivation. Okay. So what about the racially inflected story that talks about, that we're doing right after we've shown someone a picture of a firearm in the workplace? So, okay. So I want to also just slightly quibble with your description of how that story was described. Which is that Mr. Bereaves did not testify that Mr. Cachet told him he bought the AR-15 specifically for the purpose of keeping people out of his yard. What Mr. Bereaves testified to was that he said something to the effect of now that I have this, I won't have to worry about someone coming into my yard. Someone like the people who did something to me before, which just so happens to have been told in a way that's heavily racially inflected. So that part comes, again, after the part about I won't have trouble with people coming into my yard. And so I will say, again, I acknowledge that we have to take the plaintiff's version of what Mr. Cachet said was true. Setting us to one side, the question of whether giving two different versions of that, one race neutral and one not, is sufficient to survive summary judgment. You're not conceding anything by accepting the premises of my question. So my point is that that comment, while offensive, certainly not an appropriate thing to say, is well within the sort of comments that this court has repeatedly found do not rise to the level of severe or pervasive. And I can give examples of those if you would like. Oh, there's some pretty bad things that we've said aren't severe and pervasive. I mean, there's Robinson that says, you know, someone says come over to the white side. There is McIver where someone said, you know, on plaintiff's team, we were doing just fine without black people before she came. So then how do you distinguish? But on the other hand, we do have cases that also say, like, one thing, one thing, if sufficiently bad, can all by itself essentially create a hostile work environment, right? This usually involves the use of a particular word. What's your best argument for why this is not that one thing? This is the one thing kind of case. Your Honor, this is, I mean, so obviously there's a spectrum of things you can say in the workplace. And, you know, I think the sort of cases where that issue has come up the single instance are like Boyer-Liberto, where, you know, a supervisor used a slur multiple times that I won't repeat. But my best authority is all the cases we cited in our brief that say that this type of comment that plaintiff alleges, while inappropriate, again, sorry, not alleges, testified to, while not appropriate, is not. Can I just clarify what we're talking about? Because there was one of, like, accusation about who it was in the yard, but I don't think that's what we're talking about, right? Is this the story that when he was a young man in New York, he was jumped by some people and he shared the race of the people with plaintiff? Yes, that's what I understand. This is what we're talking about. There's no slur, there's nothing about the workplace. This is like an in my past, now I don't trust people because I was once jumped by some kids. Right. I just want to make sure I understand we're all talking about the same story. We are, yes. Can I take you to the Halloween party? Sure. Positing the point I made with your friend on the other side of it's a little strange because the plaintiff alleges that he was invited to the very party, but what about the comment about the people the plaintiff supervises? Which is obviously racially inflected. Yeah, so again, we have to take that at face value given the posture the case is in. It's a little difficult to know what to make of that comment. I think it's ambiguous at best, particularly considering, as you noted Judge Heitens, it was in the context of including plaintiff in the party. There's a lot of reasons why. Mr. Gochetti was plaintiff's second line supervisor, so he would have been even farther outside of the plaintiff's employees in terms of reporting chain. And as plaintiff has made clear, he had a new team. So the obvious alternative explanation is that a fourth-level supervisor doesn't necessarily want entry-level employees at a party that's going to have a bunch of supervisors on it? Could be. And also, Mr. Reeves was new, and perhaps Mr. Gochetti was just trying to include him and get to know him, given that they were going to be working on the leadership team together. But again, all of these sort of one-off points that the plaintiff raises about how we can infer that this is racially discriminatory are complicated by the fact that they all pertain to Mr. Gochetti, and it was Mr. Gochetti who hired the plaintiff, or at least he interviewed the plaintiff and recommended that he be hired after the interview, which this Court has been clear cuts against any inference of racial discrimination in cases like Tyndall and Proud. And so I think it's, talking about the hostile work environment part of it, it's a totality of the circumstances analysis, and the facts of this case, although some certainly would be troubling, and I take your point, Judge Heitens, are well within the sort of spectrum of cases where this Court has held as a matter of law there is no hostile work environment. I have just a few seconds left, so I want to touch briefly on the dismissal of the Discrete Act race discrimination claim. There were two components to that, which is first that Judge Trenga concluded that the only two actionable events in the complaint were the performance evaluation and the removal, and that plaintiff not only didn't allege that those were racially discriminatory, but expressly alleged that they were retaliatory. And nothing else in the complaint, including paragraph 40, which is what I believe plaintiff points to, changes the fundamental character of those allegations. And under this Court's decision, Lucas v. VHC Health, that alone warrants dismissal. And now I'm over my time, so unless the Court has further questions, we'll rest in our brief. Thank you. Your Honor, I just want to make a few points here. So when you're looking at just the first five months of Mr. Reeves' employment there, within three weeks he gets called into his office and told that the previous supervisors who were African-American were fired and that if he files a complaint, he would be fired too. Then a month later, there's a comment made about the performance of his division, which is mostly African-American. Then we have a Halloween party to which those African-American employees were not invited. Then we have these comments being made about the African-American beating up Mr. Chichetti and that now that he has his AR-15, this won't happen to him anymore. Then we have the comments about the clothing We do have to obviously take the evidence in the light most favorable to the plaintiff, but I don't recall reading that in the record. Now that he has an AR-15, he doesn't have to worry about people beating him. I'm making that inference, Your Honor. Let's keep it to the record. Then we have the comments about his clothing, that his pants are sassy. They give him a hot mess citation. These are not just joking comments being made. These are targeted at Mr. Reeves because Regarding the last couple of things you mentioned, didn't other employees say they received those same citations from like a post-it stack? They're not targeted at him, they're targeted at everybody there? Everybody was receiving these silly notes? I don't recall it being specifically about their pants being sassy, but there were other silly notes being passed around that were offensive. And when you take those, just in the beginning of his employment you take all of those issues, clearly Mr. Cecchetti did not want Mr. Reeves to succeed. We then have documented performance issues within the three months of his employment, which again, I want to stress to the court that Mr. Cecchetti and Mr. Gondak already had an issue with the performance of that division even prior to Mr. Reeves coming on board. Right, but the criticisms weren't about his division performing poorly, they were about his performance. That he wasn't doing things on time, he wasn't communicating, that his work product he was turning in was poor. They were about his performance, not about the division, right? They were about his performance, but in his duties as supervising, he's delegating these duties to other members of his team. So in essence they are still talking about the performance of his team and saying that they're not performing. But didn't all of his team members get positive reviews? They all got really good reviews, it looked like. That is correct, and that's even more evidence. I would argue that it's even more evidence about the fact that they're singling out Mr. Reeves saying that his performance is poor, but yet still the people that he's supervising are excelling. I don't see how the two would make sense. And those are the points that I wanted to make, Your Honor. If you have any more questions, I'll be happy to answer. Thank you. We'll come down and greet counsel and proceed with our next case.
judges: Allison J. Rushing, Toby J. Heytens, Henry F. Floyd